# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3314 | **DATE** | 2/3/2004 |
| **CASE TITLE** | Gerald O. Strauch vs. American College of Surgeons | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion targeting Third Amended Complaint Courts I and II is denied. (70-1) With no dispute existing as to a portion of the relief sought under Count VI, its motion as to that portion is granted. This case will go to trial on all of Strauch's claims, subject only to the Count VI partial limitation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

FEB 0 4 2004
date docketed

date mailed notice

**Document Number**

97

| SN | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |
|---|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

FEB 0 4 2004

GERALD O. STRAUCH, M.D.,          )
                                  )
            Plaintiff,            )
                                  )
    v.                            )    No.  02 C 3314
                                  )
AMERICAN COLLEGE OF SURGEONS,     )
                                  )
            Defendant.            )

MEMORANDUM OPINION AND ORDER

Dr. Gerald O. Strauch ("Strauch") has sued both his former

employer the American College of Surgeons ("College") and

College's Staff Members' Retirement Plan, charging federal

statutory violations and advancing some common law claims, all

stemming from the end of his employment relationship with

College.  College has moved for partial summary judgment pursuant

to Fed. R. Civ. P. ("Rule") 56 as to two, and a portion of a

third, of Strauch's claims based on the Age Discrimination in

Employment Act ("ADEA," 29 U.S.C. §§621-634[1]):  his claims that

College (1) violated ADEA, (2) did so wilfully and (3) withheld

monies due to him in retaliation for his advancing his ADEA

claims (Third Amended Complaint ("TAC") Counts I, II and VI).[2]

_____

[1]  All citations to that statute will take the form
("Section--"), using the numbering in Title 29 rather than ADEA's
internal numbering.

[2]  Though Strauch specifically cites to Section 623(d) as
the basis for his Count VI retaliation claim, he does not
specifically delineate which sections of the statute correspond
to each of his other two ADEA claims (TAC ¶74).  This court
proceeds under the assumption that the "violation of the ADEA"

97

Both sides have complied with this District Court's LR 56.1.[3]  Because Strauch has raised a genuine issue of material fact as to his age discrimination and wilful violation claims, College's motion is denied as to Counts I and II.  But because Strauch has acknowledged error as to a portion of the amount sought in his retaliation claim (an error based on mistaken information that College had given him), College's motion is granted as to that portion of Count VI.

<u>Summary Judgment Standards</u>

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, (477 U.S. 317, 322-23 (1986)).  For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)).  But to avoid summary judgment a nonmovant "must produce

---

that Strauch refers to in Count I is a claim of age discrimination under Section 623(a)(1) and that the "wilful violation of the ADEA" in Count II is grounded in Section 626(b).

[3]  LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon.  This opinion cites to Strauch's LR 56.1 statement as "S. St. ¶--," to College's LR 56.1 statement as "C. St. ¶--" and to each party's response as "S. Resp. ¶--" or "C. Resp. ¶--."  Where either party's LR 56.1 statement is undisputed by the opponent, the opinion includes only a citation to the original statement.  "S." and "C." designations are also used to refer to all other documents submitted by the parties.

more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately, summary judgment is proper only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts viewed in the light most favorable to nonmovant Strauch.

## Facts

Strauch began his tenure with College in November 1987 at age 55 (C. St. ¶¶5, 7). As Director of College's trauma and assembly departments Strauch was responsible (among other duties) for coordinating College's educational programming and its annual conference (C. St. ¶¶8-9).

In January 2000 Dr. Thomas Russell ("Russell") became College's Executive Director (C. St. ¶11). One of Russell's goals was to develop a reorganization plan ("Reorganization") that would examine College's vision and goals and revamp its organization and focus so that College would continue to be a relevant force in the medical community (S. St. ¶22; C. St. ¶13; S. Resp. ¶12).

Two things occurred shortly after Russell joined College. First he decided that as part of the Reorganization one employee

would have sole responsibility for all of College's educational
programming under a newly created Department of Education and
that the job of planning College's annual conference would be
allocated to a part-time volunteer (C. St. ¶¶23-24). Second, at
about the same time (probably in the spring of 2000) Strauch told
Russell that he anticipated staying at College only until his
15th anniversary (in November 2002) so that his pension would
vest fully[4] and he would then retire (S. St. ¶63; C. St. ¶16).[5]

Russell immediately began to look for individuals to fill

---

[4] College maintains that Strauch intended to work only
"until age seventy," which it seems to believe meant the day of
his 70th birthday in July 2002 (C. St. ¶¶19-20, C. Resp. ¶63).
Although both parties have committed a number of pages to that
subject, this Court (and now College as well, C. R. Mem. 6 n.3))
fails to see how the discrepancy in anticipated retirement date
is a material fact for purposes of Strauch's ADEA claims--after
all, both parties agree that Strauch expressed an intention to
retire in 2002 and that Strauch was actually terminated long
before either date (S. St. ¶23). And even if the exact date were
to be perceived as somehow relevant, Strauch has certainly
produced enough evidence to raise a genuine dispute about his
intended date of retirement (S. St. ¶¶64-65; S. Resp. ¶¶17, 20).
Indeed, in this and all other aspects of the parties' versions of
events it should be kept in mind that the Rule 56 approach of
drawing all reasonable inferences in Strauch's favor also extends
to the numerous respects in which his counsel points to the
impeachability of Dr. Russell as a witness--thus allowing a fact-
finder to discredit his testimony.

[5] Strauch was not the only employee whose job was affected
by the Reorganization. Nor was he the only employee who announced
an intention to retire contemporaneously with the Reorganization:
Duties performed by Dr. Olga Jonasson ("Jonasson") and John Lynch
("Lynch") were also redistributed to new positions, and both
individuals had conversations with Russell around the same time
as Strauch about their intentions to retire (C. St. ¶¶10, 25, 28;
S. St. ¶¶37-38, 51, 54-56; C. Resp. ¶¶53, 56).

the new positions (C. St. ¶29; S. Resp. ¶29). Strauch was instrumental in helping to find the prospective replacements and in transitioning his duties to them as they began their employment with College (C. St. ¶¶35, 37, 43).

Once Strauch finished his assistance in those respects, Russell told him that his services were no longer needed (C. St. ¶¶39, 50, 51; S. Ex. 5 at ACS 1756; Russell Dep. 193:21-194:19). Strauch then reminded Russell of their earlier conversations about retirement and repeated that he was not ready to retire but wanted to work for College until his 15th anniversary in November 2002 (C. St. ¶53; S. Ex. 5 at ACS 1756-57).

In an effort to resolve that conflict--Strauch had not reached his previously announced retirement date (on either party's version of that announcement), but College had accelerated the Reorganization so that his duties were already being performed by other people--both College and Russell drew up agreements that would have allowed Strauch to continue working (albeit in a new capacity and at much reduced compensation) through his 15th anniversary with College to permit full pension vesting. Although differing materially as to the salary and benefits Strauch would receive in the interim in comparison to his existing compensation, both proposals were structured so that Strauch could eventually collect all his retirement benefits (C. St. ¶¶54, 56; Russell Dep. 183:6-184:19). When negotiations

5

about those alternate arrangements eventually failed, Strauch's employment with College was terminated on December 31, 2001 (S. St. ¶23).

Application of the Rule 56 Standards

## Count I: Age Discrimination

Any employer who discharges an employee "because of such individual's age" violates Section 623(a)(1). That is precisely (and once all the smoke and mirrors are cleared away, really quite simply) what Strauch claims College has done: ended his employment with College because of his age.

Before this opinion delves into the substance of that claim, it is useful to parse the tangle of different methods available for analysis of Strauch's contention that he was the victim of disparate treatment. In that respect Strauch must raise a genuine issue of material fact as to whether College's decision to terminate him was actually motivated by intentional age discrimination (Hazen Paper Co. v. Biggins, 507 U.S. 604, 609-10 (1993)).[6] And that may be done by either of two methods--a direct method and an indirect method (Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001)).[7]

---

[6] With Russell having been the sole person responsible for the decision to terminate Strauch, his motivation is the key to Strauch's claim (S. St. ¶26; cf. Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 396 (7th Cir. 1997)).

[7] What follows in the text uses such language as what a plaintiff must "show" or "prove" because the cases talk that way,

Under the direct method a plaintiff may adduce direct
evidence that shows a clear acknowledgment of discriminatory
intent by the employer (<u>id</u>.; <u>Volovsek v. Wis. Dep't of Agric.,
Trade & Consumer Prot.</u>, 344 F.3d 680, 689 (7th Cir. 2003)).
Alternatively a plaintiff may succeed under the direct method
without any direct evidence at all by creating a "convincing
mosaic of discrimination" out of circumstantial evidence (<u>Troupe
v. May Dep't Stores Co.</u>, 20 F.3d 734, 737 (7th Cir. 1994)).[8]
Such circumstantial evidence typically includes (although it is
not limited to) suspicious timing, ambiguously discriminatory
statements, behavior towards other employees, evidence that
similarly situated non-protected employees were treated more
favorably than the plaintiff or evidence that any
nondiscriminatory reasons an employer advances for its decision
are merely a pretext for discrimination (<u>id</u>. at 736-37; <u>Volovsek</u>,
344 F.3d at 689-90).

Instead of the just-described approach, a plaintiff armed
only with circumstantial evidence may choose to pursue the

---

not because a nonmovant plaintiff needs to do anything of the
sort in the Rule 56 context. Despite that locution, this opinion
has consistently imposed the lesser "genuine issue of material
fact" burden on Strauch.

[8] It seems too late in the day to change the judicial
vocabulary to eliminate the confusion often created by the use of
"direct" with two such different meanings. <u>Troupe</u> was an
admirable effort to clear up that confusion, but it is still
encountered in some opinions.

indirect method (<u>Volovsek</u>, 344 F.3d at 692).[9]  That follows the
familiar burden-shifting roadmap first articulated in <u>McDonnell</u>
<u>Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  First such a
plaintiff creates a presumption of discrimination by producing a
prima facie case of discrimination with a set of situation-
specific requirements (<u>Schuster v. Lucent Tech., Inc.</u>, 327 F.3d
569, 574 (7th Cir. 2003)).  In response defendant must then
proffer a legitimate nondiscriminatory reason for its adverse
employment action (<u>id</u>.).  At that stage plaintiff must prove that
the employer was actually motivated by discrimination (<u>id</u>.), most
typically by showing that the employer's stated reason is
factually untrue or otherwise unworthy of credence (<u>id</u>.).

It is apparent that there are not really major differences
between the direct method through the use of circumstantial
evidence and the indirect method route.  And regardless of which
approach a plaintiff chooses, at the summary judgment stage a
court always "look[s] for proof of intentional discrimination
based on an examination of all the evidence in the record viewed
in the light favorable to the nonmoving party" (<u>EEOC v. Bd. of</u>
<u>Regents of Univ. of Wis. Sys.</u>, 288 F.3d 296, 302 (7th Cir.
2002)).  In those ultimate terms, this Court sees no reason to

---

[9]  Even a plaintiff with direct evidence could proceed under
the indirect method, although it is hard to imagine why anyone
would bother to do so (<u>Shager v. Upjohn Co.</u>, 913 F.2d 398, 401
(7th Cir. 1990)).

agonize over which label should be used to analyze Strauch's ADEA claim.

That conclusion has been reached quite apart from the effect of the Supreme Court's recent clarification in <u>Desert Palace, Inc. v. Costa</u>, 123 S.Ct. 2148, 2155 (2003) that a Title VII plaintiff need not offer direct evidence of discrimination to use a mixed-motive analysis (see, e.g., <u>Miller v. Am. Family Mut. Ins. Co.</u>, 203 F.3d 997, 1005 (7th Cir. 2000), characterizing the terms "direct method" and "mixed motives method" as synonymous). Although that holding has largely mooted the already slim differences between the methods,[10] the substantial difference in remedies afforded if the mixed motive route is followed would make it undesirable to telescope the analysis where (as here) neither side has expressed a desire to pursue that avenue.

---

[10] Given the similarities in text and purpose between Title VII and ADEA, as well as the consistent trend of transferring the various proof methods and their accompanying rules from one statute to the other, this Court considers it likely that whatever doctrinal changes emerge as a result of <u>Desert Palace</u> in the Title VII context will be found equally applicable in the ADEA arena (see, e.g., <u>Pitasi v. Gartner Group, Inc.</u>, 184 F.3d 709, 714 (7th Cir. 1999), referring to ADEA's use of the same "but for" language that forms the basis for the <u>Desert Palace</u> decision; <u>Schuster</u>, 327 F.3d at 573 n.2, using burden shifting to analyze an ADEA claim; <u>Thompson v. Proviso Township High Sch. Dist. 209</u>, 01 C 5743, 2003 WL 21638808, at *8 (N.D. Ill. Jul. 10)(actually applying <u>Desert Palace</u> to an ADEA claim); but see <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, No. 01-1359, 2004 WL 25018, at *4 n.2 (4th Cir. Jan. 5), which assumes that <u>Desert Palace</u> does not apply to ADEA, given the absence from that statute of an explicit "mixed motive" provision like that in Title VII.

Instead this opinion will forgo having to choose between the available methods because of the parties' own imprecision in identifying which method of analysis should be used. Some explanation is in order in that respect.

For its part, College initially (and incorrectly) assumed that Strauch must use the indirect method because he does not have any direct evidence of discrimination, but it then proceeded to skip right to the third stage of that analysis (C. Mem. 10).[11] Strauch, on the other hand, initially referred to the possibility of proceeding under both methods (or at least to the possibility of having some direct evidence, which appears to suggest the use of the direct method)--but then, like College, he eventually proceeded under the indirect method and also immediately skipped to the third stage of analysis without addressing the intervening steps (perhaps because College has not addressed them) (S. Mem. 9-10, 13).

That strategy of moving directly to the final stage of the indirect method is certainly permissible, and perhaps even

_____

[11] C. R. Mem. 11 does say that Strauch might not even be able to surmount his initial prima facie hurdle of producing evidence that younger similarly situated employees were treated more favorably because he has produced no evidence that any younger employee told College he or she was leaving but was not terminated earlier than the announced departure date (Schuster, 327 F.3d at 574). But because College did not raise any issue regarding the prima facie case until its reply memo, it has forfeited that issue (Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 508 n.5 (7th Cir. 1994)).

10

preferable (<u>EEOC v. Our Lady of the Resurrection Med. Ctr.</u>, 77
F.3d 145, 149-50 (7th Cir. 1996) (citations omitted)), and it
also indicates that the parties do not really need burden
shifting to flesh out their positions.  This opinion will
accordingly follow the litigants' lead by examining the evidence
to see if Strauch has raised a genuine issue of material fact (by
either direct or circumstantial evidence) as to whether College's
adverse employment action was at least in part motivated by age.

To that end this Court must first identify that adverse
employment action.  As College would have it, Strauch's "age
discrimination fails because the employment decision at issue
does not concern the <u>termination</u> of his employment but rather the
<u>timing</u> of his termination" (C. Mem. 2, emphasis in original).
So, says College, the facts that Strauch himself had planned to
retire and that his employment was at will, so that College had
the prerogative to terminate him whenever it saw fit--without
notice or cause--precludes any viable ADEA claim on Strauch's
part (C. Mem. 10-11; C. R. Mem. 1).  And College seeks support in
such cases as <u>Colosi v. Electri-Flex Co.</u>, 965 F.2d 500, 504 (7th
Cir. 1992).

But it takes only a moment's thought to recognize that the
conclusion College seeks to draw is a non sequitur.  After all,
if the timing of an employee's termination is motivated in whole
or in part by the employee's age, that is just as age

discriminatory (and hence just as actionable) as if the employee's age motivated the act of termination.

To be sure, College advances as a non-age-discriminatory explanation the contention that after it learned of Strauch's intention to retire it hired new employees to assume his duties, then addressed transitional issues, so that once the new employees took over the duties it would have been fiscally irresponsible for College to continue paying Strauch to do a job that in substance no longer existed (C. Mem. 13; C. St. ¶¶50-51; see <u>Leibforth v. Belvidere Nat'l Bank</u>, 337 F.3d 931, 934 (7th Cir. 2003)). But that position ignores the prospect that a factfinder could determine that the entire scenario was conceived and implemented by Dr. Russell (that is, by College) in a manner that was prompted in whole or in part by Dr. Strauch's age.

In short, the very issue of timing--the entire course of conduct by which Russell caused Strauch to become expendable by the end of 2001 rather than at the later time Russell knew to be Strauch's planned retirement date--was College's "adverse employment action" as defined in such cases as <u>Stockett v. Muncie Ind. Transit Sys.</u>, 221 F.3d 997, 1001 (7th Cir. 2000). And if <u>any</u> of College's decisions leading to that result was entirely or partially attributable to Strauch's age, College's ADEA-related motion must be denied.

With that ultimate question to be kept in mind as the

evidence is examined, it is time (speaking of timing) to do just that. Unfortunately that requires a good deal of exposition, because Strauch has identified a substantial amount of circumstantial evidence that could lead a factfinder to rule that College (through decisionmaker Russell) acted with a discriminatory motivation.

To begin with, Strauch points to a slew of what a jury could consider as age-related comments uttered by Russell.[12] For example, Russell explained the impetus for the Reorganization as a realization that College had "lost its relevance" and could not "just keep doing thing the old ways." As he put it, the Reorganization would allow College to "set a different course for the future" in order to "go into the 21st century" (S. St. ¶¶19, 22).

In that regard Russell noted that the Reorganization would focus on new skills because (S. St. ¶19):

> Just like a young surgeon today, a young surgeon coming out of training needs a plan to be competitive in this century. It's not going to be the same things that served Dr. Strauch or served me well in the last

---

[12] As could be expected, College's counsel seek to discount what follows in the text both (1) as capable of being read in an untainted sense and (2) as constituting "stray remarks" insufficient to carry the day in any event. But as is always true in circumstantial evidence cases, it is the cumulative effect of a number of pieces of evidence that may operate to persuade a factfinding jury--it will be remembered that the Lilliputians immobilized Gulliver by lashing him to the ground with gossamer threads that could never have done the job if only their individual tensile strength had been involved.

> century. You need new skills, and that's what we're
> trying to do with the college.

Additionally, Russell described College (S. St. ¶22) as:

> in a process of reorganizing, getting some new people
> on the bus and getting some people off the bus that had
> done a really good job, but we were in a different era.

As n.12 suggests, any consideration of the extent to which such comments may contribute to a potential inference of discrimination calls for a contextualized evaluation of the remarks--a consideration of such factors as the identity of the speaker, the substance of the comments and the causal relationship between the comments and the contested employment action (Huff v. UARCO, Inc., 122 F.3d 374, 385 (7th Cir. 1997); Erceqovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354-55 (6th Cir. 1998)). What follows looks at those factors.

As for the first factor, little need be said. Because Russell was solely responsible for the decision to terminate Strauch and Jonasson, as well as the decision to either terminate or "encourage the retirement" of Lynch,[13] the fact that Russell made all those statements increases their probative force (S. St. ¶¶26-28).

What of the comments' substance? While none is openly

---

[13] College denies that Lynch was terminated. But some documents produced by College indicate that even if he was nominally retired voluntarily, the end of his employment was sometimes referred to as a termination (C. Resp. ¶28; S. Ex. 15).

hostile towards older workers, many include "code words" for age that could potentially reflect ageist sentiments such as references to the future, different eras and new skills (Bd. of Regents, 288 F.3d at 303). And just because some of the comments are only ambiguously age-oriented does not of course mean they must necessarily be viewed as nonprobative of discrimination. Instead that fact further supports the conclusion that summary judgment is unwarranted because "the task of disambiguating ambiguous utterances is for trial, not for summary judgment" (Shager, 913 F.2d at 402).

Finally, a jury could reasonably infer a causal relationship between Russell's comments and his decisions about Strauch's job. While comments not directly related to an employment decision that is at issue generally have less evidentiary value than comments intimately associated with the decision, even seemingly unrelated "stray remarks" could contribute to a finding of liability (Schuster, 327 F.3d at 576; Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 922-23 (8th Cir. 2000); Ercegovich, 154 F.3d at 355). One example of that possibility is Russell's repetition of "21st century" language in both his general comments describing the qualities he was looking for in the person who would fill the new education position as well as when expressing his doubts that Strauch specifically had those skills. That similarity could allow a jury to infer that if Russell's

broad comments were tinged with ageism, perhaps the decisions adverse to Strauch were also tainted by discriminatory intent (S. St. ¶¶33, 35).

Additionally, some of Russell's comments to other employees such as Jonasson and Lynch could also indicate that he was associating younger employees with the kind of change he was trying to implement at College. Jonasson remembers Russell telling her that her work style would "inhibit the development of the younger people he was hiring" (S. St. ¶40).[14] Russell also testified that although Lynch was "knowledgeable" and "a real team player" he was "not what he was a few years ago" (S. St. ¶53) and that the Reorganization would affect his duties because (S. St. ¶54):

> sometimes people are doing jobs that were needed in the past but the relevance of that job and maybe some of those groups doesn't exist today like it did a few years ago.

Again, although those statements do not pertain directly to Strauch, the comments could support an inference that if Russell harbored discriminatory motives when making decisions regarding Jonasson and Lynch, the same motives could well have played into his decisions about Strauch (Huff, 122 F.3d at 386).

---

[14] Russell's deposition testimony waffles on whether his recollection coincides with Jonasson's on this point--a discrepancy that further calls into question Russell's credibility and raises issues that must be hashed out at trial (S. Resp. ¶59; C. Resp. ¶47).

16

To repeat the point made in n.12, it may be unlikely that any of those comments could alone raise a sufficiently strong inference of discrimination to overcome summary judgment. Indeed, College will be able to argue to the jury that even those comments in combination would not suffice. But once again it is the totality of circumstantial evidence--the other matters discussed hereafter, as well as what has been covered to this point--that pose a jury question.

Before this opinion turns to the evidence other than Russell's statements to which Strauch points, attention should be paid to one specific category of his comments. Those comprise Russell's conversations with Strauch (and Jonasson and Lynch) about their retirement plans.

In that respect the question is <u>not</u> whether College terminated Strauch because he was about to retire or whether College systematically terminated employees who were about to retire. <u>Hazen Paper</u>, 507 U.S. at 611-12 teaches that although retirement and age are correlated, they are also analytically distinct--so that such a motive (although perhaps not legal because of other statutes) does <u>not</u> violate ADEA as such (see also <u>Leibforth</u>, 337 F.3d at 934). Instead retirement-related inquiries could be probative of a discriminatory campaign to encourage older employees to leave College, with questioning employees about retirement being a part of that effort (<u>Kaniff v.</u>

<u>Allstate Ins. Co.</u>, 121 F.3d 258, 263 (7th Cir. 1997)).

Courts of course recognize that an employer "has a legitimate interest in learning its employees' plans for the future and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct" (<u>Colosi</u>, 965 F.2d at 502). But even so, such inquiries that surpass the bounds of reasonableness could contribute to an inference of age discrimination (<u>Cox v. Dubuque Bank & Trust Co.</u>, 163 F.3d 492, 497 (8th Cir. 1998)).

All of that forms the matrix for an examination of Russell's retirement-related conversations with each employee. As for Strauch himself, it was Russell and not Strauch who broached the subject in May 2000 when Russell told Strauch of the Reorganization. Russell characterizes that as a congenial conversation in which Russell first said that College was making bigger plans and wanted to make sure that Strauch's plans fit in with those plans, and then Strauch assertedly responded with a clear statement that he planned to retire "at age seventy" (Russell Dep. 70:14-73:5). Yet Russell also acknowledges that his conversation with Strauch about retirement was also part of a larger scheme to "get people to understand what we were trying to do...that the strategic plan was rolling out and that we were going to be reorganizing and sort of reshuffling, changing

responsibilities" (S. St. ¶51).[15]

That additional layer is fleshed out by examining conversations that Russell had with other employees about retirement. Russell spoke extensively with Lynch about his retirement plans and the Reorganization and testified that because the Reorganization "sort of rang his bell," Lynch's decision to retire (assuming for the moment that he was not terminated) was undoubtedly connected to his realization that his job was going to be eliminated as part of the Reorganization (C. Resp. ¶¶25, 56; S. St. ¶51).

Russell's conversations with Jonasson about retirement were also closely linked to discussions about job elimination. Russell maintains that Jonasson had previously suggested to him that she was willing to retire when Russell thought the time was right but that she reneged on that score when Russell indicated to her that the College was "moving into a new era" and that the Reorganization would provide a good occasion for her retirement

---

[15] There is more than one way to view College's change in position, when Strauch complained that Russell's original termination deadline deprived him of the anticipated vesting of his retirement benefits, to one that would allow him to stay on in a consulting role through his 15th anniversary--but with no more money to be paid him than under Russell's original ukase. That revised proposition might be taken by a factfinder to indicate that College was not attempting to purge itself of an employee who was nearing retirement so as to cut off his impending retirement benefits (see C. Ex. 6, Consulting Agreement ¶4). And the factfinder might then reasonably read that as an indication that Russell's retirement inquiries served another (perhaps age-discriminatory) purpose.

(Russell Dep. 304:19-305:9). Jonasson recalls the incident very
differently. She maintains that Russell threatened her with
termination if she did not retire (or become a part-time
employee) as part of the Reorganization (S. St. ¶¶37-39, 40-42).

For Rule 56 purposes, the need to draw reasonable pro-
Strauch inferences calls for discrediting Russell's version of
events in favor of Strauch's and Jonasson's. That being so,
there is at least a genuine issue of material fact as to whether
Russell's inquiries were reasonable under the circumstances or
whether he hounded Strauch and other older employees enough to
begin to raise an inference of age discrimination (see <u>Kaniff</u>,
121 F.3d at 263).

So much then for the impact of decisionmaker Russell's
statements. But in addition, a factfinding jury could reasonably
find that inconsistencies on College's part in seeking to justify
its decisions regarding Strauch also weigh in the scales to
create the required issue of material fact.

Thus even though College stresses Strauch's declared
intention to retire as its motivation for terminating him and for
its other actions in connection with that termination (C. Resp.
¶32; C. Mem. 13), Russell's testimony labels the Reorganization
as the "real" impetus for its actions (S. Resp. ¶29):

> It was really the restructuring of the college, and the
> fact that he had stated that he wanted to retire at 70
> was sort of something else. But the real thing was that
> we were reorganizing The American College of Surgeons.

And elsewhere Russell points to asserted deficiencies in Strauch's performance as motivating his termination decision (Russell Dep. 98:2-102:22, S. Ex. 9 at Resp. ¶4)--an assertion wholly at odds with College's agreement that Strauch was "not fired for poor performance" and that the termination was "unrelated to his performance of his job duties and responsibilities," as well as by the overwhelmingly positive performance reviews that Strauch had received from Russell throughout the course of his employment (S. St. ¶¶11-12, 15-16; Fisher, 225 F.3d at 920-21).[16]

That concludes a review of the evidence from Strauch's perspective, as Rule 56 requires. And as stated earlier, the combination of Russell's statements and other circumstantial evidence, viewed through a pro-Strauch lens, suffices to raise a genuine issue of material fact about the possibility of age discrimination (Zaccagnini v. Chas. Levy Circulating Co., 338

---

[16] These are only examples of dubious testimony by Russell that a jury could rationally view as substantially--or even entirely--destroying his credibility. For example, at one point during his deposition Russell said that he thought Strauch was entitled to be paid for the period from December 31, 2002 to January 11, 2002--but then, after taking a break for a brief private conference with College's counsel (a questionable tactic in itself), he changed his testimony to say that he believed College was not obligated to pay Strauch for that same period (S. St. ¶67, but see C. Resp. ¶67). This Court questioned Russell's credibility on that issue in an earlier proceeding (see 9/22/03 Tr. 13). While not of course conclusive, such gaps in Russell's credibility record could well be enough to fend off summary judgment (Schuster, 327 F.3d at 578).

F.3d 672, 676-77 (7th Cir. 2003)).

One final point should be addressed: College's contention
that Russell's own membership in the ADA-protected class (he was
61 when he terminated Strauch) weakens any inference of
discrimination (C. Mem. 14). Quite apart from the obvious
proposition that shared status in a protected class between
plaintiff and decisionmaker does not preclude a finding of
intentional discrimination (see, e.g., United States v. Crosby,
59 F.3d 1133, 1135 n.4 (11th Cir. 1995)),[17] the most that such
shared status could do would be to add a factor on College's side
of the balance scales--but it must be remembered that the
weighing of evidence plays no part in Rule 56 jurisprudence.

Moreover, in an ironic way a factfinding jury could well
view Russell's status as a member of the ADEA-protected class as
a factor contributing to a decision motivated at least in part by
age discrimination. Russell said that he did not think that he
himself would be qualified for a job similar to any of the new
positions that would call for performing Strauch's assigned
duties after the Reorganization (S. St. ¶36):

> I mean, you know, I look at myself. I don't have those
> skills. I mean, I was an active surgeon teaching

---

[17] Relatedly, the fact that both employees who took on
Strauch's duties were over 40 does not necessarily weaken the
potential for an inference of discrimination. That is
particularly so because both of those individuals were
substantially (more than 10 years) younger than Strauch (C. St.
¶¶41, 46; S. St. ¶29; Bd. of Regents, 288 F.3d at 302).

> students and residents, and it's a very different era
> right now.

It is surely a permissible inference that Russell's self-perception of his own lack of skills, in light of his age, also extended to Strauch--a mindset that represents the very kind of stereotyping that ADEA prohibits (<u>Hazen Paper</u>, 507 U.S. at 511-12).

## Count II:  Willful Violation of ADEA

ADEA provides for liquidated damages only where a defendant's conduct has been "willful" (Section 626(b)). Employers commit willful violations when they know that their conduct is prohibited or when they recklessly disregard the possibility that their conduct is prohibited (<u>Appelbaum v. Milwaukee Metro. Sewerage Dist.</u>, 340 F.3d 573, 581 (7th Cir. 2003)).  Conversely, no employer is in willful violation of the ADEA where it incorrectly but in good faith believes its conduct is not prohibited (<u>id</u>.).

At this stage of the case, with the question of College's liability for Strauch's underlying discrimination claim still open, it is obviously premature to entertain a willfulness determination.  College's summary judgment motion is denied as to Count II as well.

## Count VI:  Retaliation Under ADEA

In part Strauch's Count VI retaliation claim charged not only a retaliatory delay in the payment of amounts due him from

23

College but in one instance--the payment of his benefits under College's Severance Plan--a shortfall of some $200,000 in the amount ultimately paid to him on December 30, 2002 (well after he brought suit). Now College has confirmed that its original larger figure as represented to Strauch had been a "typo," and Strauch has accepted the accuracy of the later (and much lower) figure.

College's characterization of its motion to verify that Strauch is no longer seeking the higher amount really does not fit the Rule 56 mold, as contrasted with its being a Rule 16 issue-narrowing motion. Strauch's responsive memorandum devotes only a brief footnote (S. Mem. 18 n.7) to a confirmation that he had "separately notified defendants that he is not seeking that difference based upon the representation that the higher amount was provided in error," so that "[t]his aspect of the motion was, at best, unnecessary." In light of the absence of dispute over the substance of the motion, this Court grants it (even though Strauch may be right as to the lack of necessity, this ruling confirms the matter of record).

## Conclusion

Because of the existence of genuine issues of material fact, College's motion targeting TAC Counts I and II is denied. With no dispute existing as to a portion of the relief sought under TAC Count VI, its motion as to that portion is granted. This

case will go to trial on all of Strauch's claims, subject only to the Count VI partial limitation.

_____
Milton I. Shadur
Senior United States District Judge

Date: February 3, 2004